## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**GERALD GILL,**

     **Plaintiff,**

**vs.**                                                             **CASE NO. 4:06CV178-MP/AK**

**DR. SCOTT THAYER,**
**et al,**
     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this cause pursuant to 42 U.S.C. §1983 alleging that Defendants Dr. Frank Johanson[1] and Dr. Scott Thayer were deliberately indifferent to his serious medical needs. (Doc. 1). Defendants have responded by filing a special report (doc. 73), which has been construed as a motion for summary judgment. (Doc. 77). After a period of discovery, Plaintiff has responded. (Doc. 123).

_____

[1]  Plaintiff included in his response a request to dismiss Defendant Johanson on the grounds that he learned during discovery that Johanson was not responsible for the decisions regarding his health care that he complains about in his complaint. Because the request was not docketed as a separate motion, the undersigned has by separate order requested that it be docketed as a motion to allow Defendants to respond, if they wish. Consequently, the undersigned does not address the claims against Johanson in the Report and Recommendation submitted on this date, but will supplement this R&R concerning the claims against Defendant Johanson after November 12, 2007.

    Plaintiff also moved to join Case No. 4:07CV222-SPM/WCS with the present case because the Defendant in Case No. 4:07CV222 is the Defendant identified in discovery in the present case that made the initial decision to deny the Depo-Testosterone injections, not Defendant Johanson. After Defendants are given the opportunity to respond to the request to join the cases, the undersigned will enter an order on the issue of consolidation.

I.      **Allegations of the complaint (doc. 1)**

Plaintiff claims that he had been taking testosterone all of his life because of testicular cancer and had two prosthetic testicles implanted as a child.  He claims that after his incarceration Dr. Johanson[2] made the decision to stop giving him testosterone resulting in the shrinking of his scrotum, which caused him to have both prosthetic testicles removed.  Plaintiff claims that Dr. Abramson, who removed both prostheses, told him that the lack of testosterone has caused the shrinking and made it necessary to remove the prostheses.  Plaintiff further claims that Dr. Thayer was Chief Medical Officer, and although he acknowledged in a letter to Tallahassee that the testosterone was necessary for Plaintiff's medical condition, he did nothing to get this medication to him, even though he was made aware that the medication had been discontinued through the grievance process.[3]

Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages of $250,000. and $10,000. respectively from each Defendant.

a)      Grievance dated February 6, 2005 (exhibit A)

Plaintiff requests a urology consultation from the medical staff at RMC so that he could be placed back on testosterone.  He was told that his primary care provider at Jefferson CI was responsible for scheduling specialist appointments.

_____

[2] As explained in Plaintiff's motions to dismiss and for joinder, he learned through discovery that Johanson did not make this decision.  (Doc. 123).

[3] Plaintiff's claim that Dr. Johanson refused him pain medication for his neuropathy will not be addressed in this Report and Recommendation.  See n.1.

**No. 4:06cv178-MP/AK**

b)     Grievance Appeal dated February 15, 2005 (exhibit B)

Grievance: "I was brought to RMC because two of my prescriptions were refused by Tallahassee.  One was for neurological pain and the other was for hormone replacement.  Our new Doctor at Jefferson CI did not hardly put any information on the prescription such as I have been taking testosterone all of my life.  This was due to having testicular cancer.  My body makes absolutely none.  I have been on testosterone the 2 years I have been in prison.  Here at RMC I saw the Pain Doctor but not the urologist.  Mrs. Davis in Medical says that I have no appointment for the urologist.  Jefferson sent a request back to me that said I was at RMC for a consult on this.  Can someone please help me get my medication before I start having adverse reactions.  Thank you."

Response: "You were seen on 02/11/05 by the pain management physician, Dr. Vincente as stated.  However, the Urology consult that was done at Jefferson CI was not submitted.  Today 02/22/05 you were seen in the Emergency Room and discussed your issue with the Emergency Room Physician.  Formal Grievance Denied."

c)     Grievance dated 7/20/05 (exhibit C)

To summarize the three page grievance, Plaintiff broke his complaints into three parts.  Concerning the testosterone, Plaintiff explained that he had been on the medication since he was 13 and had received it regularly since his incarceration in 2002 until January 2005, when the testosterone was denied.  He was brought to RMC in January because of two referrals for pain management and urology. When he saw Dr. Abramson, the urologist, Plaintiff recalled that Abramson stated it was "absolutely

**No. 4:06cv178-MP/AK**

medically necessary" that he receive this medication and that it would cause "irreversible changes" if he was denied the medication for a long period of time. The following month, Dr. Abramson removed a trapped prosthetic testicle from Plaintiff which he allegedly told Plaintiff was trapped because of "a shrinking scrotal sack," resulting from the denial of testosterone for the previous month and a half.  Dr. Abramson wrote Plaintiff a prescription for one year for which Plaintiff was written a "DER" [Drug Exception Request] for 90 days.  Plaintiff stated that he got the testosterone for 90 days, but when the 90 day supply was gone and he went to sick call for a refill he was told by Dr. Tran that the "head doctor" had denied him anymore testosterone. Dr. Tran suggested to Plaintiff to write the Medical Director, which he did, but received no reply.

Plaintiff also complained about not receiving any pain medication for the paranthesias resulting from his Guillane-Barre Syndrome.  Plaintiff complained that he had received a narcotic, Tylenol 3, before, but was trying to find an alternative to narcotics and was prescribed Cymbalta, but never got it.

In his third complaint, Plaintiff stated that the medical department was not adequately treating his GBS.

Response (by Defendant Thayer) dated 8/9/05: "Per phone conversation with Jefferson CI Infirmary, your testosterone was prescribed last week.  You have the option of discussing your pain and possible pain reliever with your primary care physician at Jefferson CI.  Grievance is denied."

**No. 4:06cv178-MP/AK**

d)      Letter from Pilar Gudino dated August 8, 2005 (exhibit D)

Ms. Gudino, Impaired Inmate Services Coordinator, writes:

This office is in receipt of your letter dated 7/17/05.  In your letter, you expressed concerns regarding not receiving your Depo-Testosterone injections.
Please be advised that this  office has looked into the situation by reviewing the records available to us.  In addition Dr. Thayer, Chief Health Officer at RMC was contacted and he provided this office with information regarding the issues you presented.  Dr. Thayer has determined that the Depo-Testosterone injections are clinically indicated.
Records indicate that you began you injections on August 3, 2005.
You are encouraged to cooperate with your heath care staff by following the treatment regimen prescribed.
By copy of this response to you, I am forwarding your letter to your Chief Health [sic] for his review and further disposition as deemed appropriate.

e)      Informal Grievance dated 2/2/05 (exhibit E)

Plaintiff complains that Dr. Gillardo wrote 2 DER's for him for testosterone and Gabatril, but did not explain what they were for and they were disapproved "saying there are no adverse reactions to not receiving testosterone."

Response: You have been transferred to RMC on a consult for evaluation.

f)      Informal Grievance dated 12/29/05 (exhibit F)

Plaintiff complains that he has lower extremity paresthesias because of GBS and was prescribed Cymbalta for pain, but he had not gotten the DER for the pain medication.

Response: "Yes, please sign up for sick call."

**No. 4:06cv178-MP/AK**

g)      Grievance Appeal dated 1/3/06 (exhibit G)

Plaintiff complains that his GBS causes extreme weakness, but it takes 2 to 3 months to schedule an EMG which is useless because he is walking by that time.  He explains that Dr. Gama recommended a nerve biopsy, but it must have been denied.

Response: The EMG done on 2/6/05 resulted in normal findings. Recommendation was to follow-up the issue clinically in which Medical staff is conducting.  You continued to be followed up in your clinic without any clinical indication; however, if you continue to have a problem, please sign up for sick call.

h)      Grievance Appeal dated 1/24/06 (exhibit H)

Plaintiff complains that Dr. Johanson decided that he would have no adverse reaction to the discontinuation of his testosterone, but he lost both testicles and he wants them replaced.

Response: You indicated that your testosterone injections were discontinued, and you need to be prescribed.  You were evaluated in doctor's clinic on 18 January. Clinical Associate Gardella submitted a request to Dr. Johanson for authorization to prescribe Depo-Testosterone Hormone Replacement.  The request was approved.

i)      Grievance Appeal dated 1 /25/06 (exhibit I)

Plaintiff states that went to sick call two weeks before about the neuropathy in his legs and feet and Mrs. Gardella said there was nothing in the formulary to treat it, she would ask Dr. Johanson about it, but nothing was done and he has received no medication.

**No. 4:06cv178-MP/AK**

Plaintiff wrote again on 3/9/06 that the response was to the wrong grievance and it was past 30 days.

Response: It is determined that the response made to you by the institution on 1/20/06 appropriately addresses the issues you presented.  It is the responsibility of your medical staff to determine the appropriate treatment regimen for the condition you are experiencing.

      j)      <u>Response dated 2/22/06 (exhibit J)</u>

            07A (General Medical (Medical))

      k)      <u>Medical Records (exhibit K)</u>

Plaintiff admitted to RMC on April 14, 2005, for 3 day history of lower extremity weakness culminating in an inability to walk.  He had been diagnosed with Guillain-Barre Syndrome for a year, paresthesia, hypogonadism, bipolar disorder and asthma.  A nerve conduction study done on 7/15/2004 was normal.  His current medications showed "Testosterone Depo 400mg due on 4-23-05" among other medications and his Admission Plan included testosterone on 4/23/05.

Treatment notes show on July 15, 2004, Plaintiff was "barely able to walk," and was taking testosterone every 2 weeks.  A lumbar puncture, MRI and EMG, was done to discover the cause of the extreme weakness and after the spinal fluid came back abnormal he was referred to Dr. Gama, a neurologist.  His hands had started becoming numb.  By July 26, 2004, it was suspected that Guillaine Barre Syndrome was the cause.  By August 11, 2004, Dr. Thayer had started Gabitril.

**No. 4:06cv178-MP/AK**

l)      Grievances (exhibit L)

On March 5, 2006, Plaintiff complains that he has not been treated for his GBS parasthesias and kept getting told to return to sick call, which he must pay for.

Response: Your medical issues were discussed with Dr. Johanson, Regional Medical Director.  The medication was denied by Dr. Johanson.  You have been provided alternative medication.  You have an upcoming appointment with Dr. Johanson to discuss this issue.

On February 6, 2006, Plaintiff complains that the wrong DOC number was placed on the prescription for pain medication so he had not been getting any, so he went to sick call where Ms. Gardella said she would call Dr. Johanson, but it never happened and all he was receiving was Ibuprofen.

Response: I spoke with Ms. Gardella regarding your request.  Ms. Gardella did speak with Dr. Johanson.  If the Motrin does not help, you have the option to return to sick call.

On February 14, 2006, Plaintiff wrote that he went to sick call for the pain and on 1/18/06 for his testosterone, and asked that they get him something for the pain, the Ibuprofen was not working and he needed his testosterone order "straight."

Response: On review of your record, it was noted you did return to sick call.  The chart has been referred to the ARNP for review.  This was done by the sick call nurse.

On March 29, 2006, Plaintiff wrote that the nurse kept forgetting to order his testosterone, which he was supposed to take every 2 weeks and which was supposed to be maintained at a certain level.  At this time his injection was a week late.

**No. 4:06cv178-MP/AK**

Response: Your testosterone is ordered once a month.  On 2/27/06 it was ordered.  ON 3/27/06 it was ordered.  A DER had to be approved by the Regional doctor that has been faxed.

m)   <u>Memorandum and Detailed Facts (exhibit M)</u>

Plaintiff describes in a chronology of events that on !2/20/04, he was taken back to Jefferson CI after being treated at RMC for his GBS with prescriptions from Dr. Gillardo for Gabitril for his neuropathy and Testosterone injections every 2 weeks. Upon his return Dr. Johanson denied the Drug Exception Rule forms completed by Dr. Gillardo for non-formulary drugs stating that Gabitril was not for chronic pain and that there would be no adverse reaction to denial of the testosterone.  Plaintiff stated that Dr. Johanson had been medical director at another prison where Plaintiff had received testosterone and that Dr. Johanson was familiar with his case and that Plaintiff had been receiving this medication since he was a child.  Dr. Gillardo told Plaintiff that Dr. Johanson had denied him the medication and had Plaintiff sign two referrals to RMC for a urology consult and pain management to see if he could get his testosterone.  In the meanwhile, Dr. Gillardo prescribed Plaintiff Tylenol #3 for pain, but told him there was nothing he could do about the testosterone until after the consult.  When Plaintiff arrived at RMC he was told he was only there for a pain management consult.  He began writing grievances to remedy the situation, but RMC and Jefferson CI told him the other institution had to write for a urology consult and he began having severe pain in his testicles.  Before he got a response he was seen in the Emergency Room and given an emergency referral to urology where Dr. Abramson told him he must take testosterone

and that he would have to have surgery to remove the trapped testicle.  A few weeks later he was back in the hospital unable to walk from his GBS.  Dr. Gama told him a nerve biopsy was needed, but Dr. Thayer denied the procedure.  He returned to Jefferson in late July 2005 and was already having trouble getting his testosterone before he left.  Dr. Tran told Plaintiff that Dr. Thayer had denied his medication for the GBS neuropathy and the testosterone.  Shortly thereafter (around the first of August) Plaintiff was taken by ambulance to Tallahassee where it was suspected that his chest muscles had become affected by the GBS causing him difficulty in breathing.  He was still not receiving his testosterone and his family began calling Central Office.  He received a letter stating that Dr. Thayer found his testosterone to be clinically necessary.  By this time however it was noted that his other testicle had drawn up and was painful and it was removed later that fall by Dr. Abramson, who remarked that any doctor should know that the absence of male hormones would have adverse reactions.

Plaintiff now has no testicles and is permanently disfigured.  He also continues to experience pain from the neuropathy.

## II.    Standard of Review

A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case."  Nolen v. Boca Raton Community Hospital, Inc., 373 F.3d 1151, 1154 (11th Cr. 2004), *citing* Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).  All issues of material fact should be resolved in favor of the Plaintiff or non-moving party before the Court determines the legal question of whether the defendant is

entitled to judgment as a matter of law under that version of the facts.  Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).   The Plaintiff has the burden to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  Celotex, 477 U.S. at 322-23.  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record."  Mize v. Jefferson City Board of Education, 93 F.3d 739, 742 (11th Cir. 1996).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998), quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

**No. 4:06cv178-MP/AK**

While a moving party is not required to support his motion for summary judgment with affidavits, Celotex, supra at 323, the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment.  Gauck v. Meleski, 346 F.2d 433, 436 (5th Cir. 1965).

### III.   Defendants' Relevant Rule 56(e) evidence (doc. 77)

   a)   Affidavit of Dr. Frank Johanson (exhibit 2)

Dr. Johanson is the Medical Executive Director for Region I and is familiar with Plaintiff's case.  He denies that he denied a request to approve testosterone injections in January 2005 because he did not have the authority to approve that drug.  He has attached a DER dated January 12, 2005, and completed by S. Gallardo which was disapproved by the Regional Medical Executive Director (signature not identified) with the notation, "Why is hormone replacement necessary, there is no adverse effect upon withholding this med."  Dr. Johanson states that the first request for testosterone that he had authority to approve was sent to him on January 19, 2006, and he denied this request because it was in the form of Androderm patches and he sent instructions to the institution to resubmit the request asking for injections.  (Exhibit 2).  On January 24, 2006, the request was resubmitted and approved.  (Exhibit 3).  Another request was submitted and approved on March 31, 2006, for a 90 day supply.  (Exhibit 4).  And another request was approved on June 5, 2006 for one year.  (Exhibit 5).

Dr. Johanson explains that Plaintiff was diagnosed with GBS in July 2004, and prescribed Gabitril.  (Exhibit 6).  The first request for this medication was received by Dr. Johanson on January 13, 2005, which he denied stated "Drug not indicated for chronic

pain, consider referral to RMC pain clinic." (Exhibit 7).  He explains that Gabitril was an anti-epilepsy drug that had been used to treat paresthesia and neuropathic pain, but the manufacturer had recommended that it only be used to treat epilepsy and the FDA had only approved it for this use.  (Exhibit 8).  It had been documented that it could cause seizures, even status epilepticus (a particularly dangerous event when patients have continuous seizures without regaining consciousness in between) when used in non-epileptic patients.  In early 2005, the FDA requested the manufacturer to place this warning on the package.  Thus, Dr. Johanson did not approve Gabitril for use in treating Plaintiff's neuropathy, but other drugs were given to Plaintiff such as Tylenol #3, Hydrocodone and Oxycodone.  (Exhibit 9).  Plaintiff was also given a pass for a wheelchair, bed rest, low bunk, and activity restrictions.  (Exhibit 9).

      b)    <u>Affidavit of Dr. Scott Thayer (exhibit 3)</u>

Dr. Thayer is Regional Medical Executive Director for Region II.  Dr. Thayer states that he never denied Plaintiff his testosterone injections or pain medication.  Dr. Thayer received the first request for testosterone on March 23, 2005, which he approved for one year. (Exhibit 1).  On April 20, 2005, he approved a supplemental dose following the surgical removal of one of Plaintiff's testes.  (Exhibit 2).  On July 13, 2005, Plaintiff wrote a grievance complaining that he had not received his injections, but the response from C. Davis stated that no one had denied his injections and records showed that he had received the injections in April, May and June of 2005.  (Exhibit 3)[4].

---

    [4]  This exhibit is a copy of a grievance filed by Plaintiff on 7/13/05.  The response is mostly illegible, but has been offered to support Defendant Thayer's contention that "his records indicated that he had received his testosterone in April, May, and June of 2005."

**No. 4:06cv178-MP/AK**

Plaintiff wrote Central Office in July that he was being denied his injections and Central

Office contacted Dr. Thayer who told them the injections were necessary and that

Plaintiff had been given one on August 3, 2005.  (Exhibit 4).  On October 25, 2005, Dr.

Thayer approved switching Plaintiff to the patches because he was reacting adversely

to the injections at the injection site.  (Exhibit 5).

Plaintiff was seen in the emergency room on February 22, 2005, for issues about

his testicles and the physician assessment was that he needed to be on depo-

testosterone.  (Exhibit 7).  That assessment includes the notation that Plaintiff presented

with "testicle shrinkage-size of large walnut-very hard..(L) testicle hard-size lg gum ball.

I/M with testicular can hx with treatment of testosterone which hasn't received in 2 mos.

I/M has donor testicles.  C/O pain in area...."  (Exhibit 7).  The plan was to get depo-

testosterone and a "urology consult ASAP."  (Exhibit 7).  In a grievance dated February

25, 2005, Thayer attests that Plaintiff stated that he had gotten his shot.  (Exhibit 8).[5]

Plaintiff was seen by Dr. Abramson, a urologist on February 28, 2005, for a trapped

right testicular prosthesis.  (Exhibit 9).  Plaintiff complained in a grievance dated July 20,

2005, that he was not receiving either his testosterone or pain medication (exhibit 10),

but Dr. Thayer had approved his testosterone injections from March 2005 through

March 2006.  (Exhibit 1).  Dr. Thayer on August 7, 2004, had approved Gabitril (exhbit

11), it was Dr. Johanson who disapproved it.  Dr. Thayer states that after he approved

Gabitril he was not presented with other pain medication requests and understood that

Plaintiff was receiving Tylenol #3 and Motrin, which did not require his authorization.

---

[5]  Plaintiff says in the grievance, "Thank you so much for getting my testosterone
shot lined up.  I did receive it."

**No. 4:06cv178-MP/AK**

c)    Affidavit of Dr. Mark Abramson (Exhibit 4)

Dr. Abramson saw Plaintiff on February 25, 2005, and understood that Plaintiff

had both testicles removed as a child with two testicular prosthesis in place and was on

hormone replacement.  Plaintiff complained of pain and discomfort from his right

prosthesis and Dr. Abramson diagnosed a trapped prosthesis and recommended

surgical removal.  (Exhibit 1).  He also recommended monthly depo-testosterone

injections.  (Exhibit 1).  He removed Plaintiff's right prosthesis on March 28, 2005.

(Exhibit 2).  On August 29, 2005, he examined Plaintiff for pain in his left prosthesis,

which was removed on October 3, 2005.  (Exhibits 3 and 4).  Dr. Abramson stated that

Plaintiff requested removal and to switch from injections to a patch.  (Exhibits 3, 5-6).

Dr. Abramson does not recall ever telling Plaintiff that his scrotum had shrunk from not

receiving testosterone and in his opinion, within a reasonable degree of medical

probability, if Plaintiff's scrotum had shrunk it was not from being off testosterone for two

months or less.

**IV.    Plaintiff's Response (doc. 123)**

a)    Plaintiff's Affidavit

Plaintiff claims that the DER provided by Dr. Thayer offered to show that Thayer

approved the testosterone injections (Exhibit 1 to Thayer's affidavit) is fabricated since

Plaintiff contends that he saw Dr. Ilano, the doctor completing the DER offered by the

Defendant, over a year prior to the DER request date.  In support, Plaintiff offers a DER

completed on March 25, 2005, by Dr. Tran, whom he contends was his treating

physician on this date, not Dr. Ilano, which shows Dr. Thayer's stamp, but not his

**No. 4:06cv178-MP/AK**

approval on the form.  (Doc. 123, Exhibit 10).  According to Plaintiff, a form not marked

either approved or disapproved is considered not approved and the result was that the

pharmacist did not provide him the injections on this ground.  Plaintiff also offers in

support of his contention that Dr. Thayer had knowledge that he was not receiving his

objections and failed to act the grievances attached to Thayer's affidavit, which he

signed.  (Doc. 77, Thayer Affidavit, Exhibits 6 and 10).  Plaintiff contends that he had no

recourse but to seek help from Dr. Thayer because none of his treating physicians could

get his injections for him without Thayer's approval, and despite the efforts of Dr. Tran

and Dr. Abramson and the many grievances Plaintiff filed, Thayer took no action to help

him and this constitutes reckless and callous disregard for his serious medical need.

     b)     <u>Pictures (exhibit 1)</u>

Plaintiff has provided pictures of his current physical condition which shows no

testicles.

     c)     <u>Physicians Order Sheet dated 10/25/05 (exhibit 2)</u>

Form shows that Plaintiff was ordered Depo-testosterone for one month.

     d)     <u>Emergency Room Records (exhibit 3)</u>

Plaintiff has provided documentation for three visits: 2/22/05;8/20/05; and

9/15/05.  At his first visit, Plaintiff presented with pain in the right testicle and it was

noted that both testicles had shrunk.  The doctor also noted that he "needs Depo-

testosterone" and a "uro consult" was to be scheduled "ASAP."

On August 20, 2005, Plaintiff presented with pain at his left testicle "similar as

last time in March 05."  An urgent urology consult was planned.

**No. 4:06cv178-MP/AK**

On September 15, 2005, Plaintiff again presented with a painful left testicle.

e)      Health Care Information Request Record (exhibit 4)

Form shows that Plaintiff's health care information was requested by himself, his mother, and Central Office on April 26, 2005.

f)      DOC Drug Formulary Process (exhibit 5)

Pertinent to the facts in this case is that "[i]t is essential that a non-formulary item not be issued to an inmate without a signed and approved DC4-468." (DER).

g)      Drug insert for Depo-testosterone (exhibit 6)

Recommended dosage is 50-400 mg every two to four weeks.

h)      Article from Wikipedia on Testosterone (exhibit 7)

Includes information about the effects testosterone has on the body and what happens when its is depleted or exists in low levels in the body. [There is nothing that states specifically that failure to administer testosterone once therapy has begun will result in shrinkage of the scrotum].

i)      Andropause from Wikipedia (exhibit 8)

Andropause occurs in men between ages 40 and 55, much like menopause in women, and is marked by a decrease in testosterone.  Affects "include erectile dysfunction, loss of muscle mass, irritability, generalized fatigue and even problems with memory and cognition...[o]ther longer-term risks of low testosterone are gradually coming to light.  Testosterone plays a role in maintaining cardio-vascular health, prevention of bone-thinning (osteoporosis) leading to low-impact hip fracture, and a variety of other body functions."

**No. 4:06cv178-MP/AK**

j)      Medication and Treatment Record (exhibit 9)

Plaintiff has provided a medication log dated 02/05 which does not show clearly if the shots were given or precisely when.  There are boxes highlighted[6] at days 8 and 21, but beside 21 is the notation "D/C 1 /25/05."  A log dated 10/20/06 also does not show injection dates by the prescription, as indicated for other medications which were to be given daily.  Physician's Order sheets show Depo-testosterone was ordered on 10/25/05, 4/27/06 (date is unclear) and 1//27/06 (date is unclear).

k)      Drug Exception Request dated March 25, 2005 (exhibit 10)

A request for a 12 month supply of Depo-Testosterone is made by Dr. Tran with the notation that Plaintiff had hypogonadism and had his testicles removed as an infant. The Authorization section is stamped by Dr. Scott Thayer, but is not marked as approved or disapproved.  The Pharmacy signed receipt of the DER on 4/4/05, but there is no date indicating that the prescription was dispensed.

l)      Physician's Order Sheet dated 2/28/05 (exhibit 11)

Signed by Dr. Abramson, the request is for a year's supply of Depo-testosterone. On the form is written "DER needed," "SCRB MD can you please do DER," and "Done 3-23."

m)      Medical Records (exhibit 12)

Treatment note of 3/24/05 shows Plaintiff came to ER for pain at right testicle. "He has trapped rt testicle prosthesis."  Incidental note of 3/25/05 by Dr. Tran states:

---

[6]  The boxes are not checked, but the outside lines of the box under each date appear to have been drawn over several times.

**No. 4:06cv178-MP/AK**

Pt has hypogonadism due to bilateral orchictomy as an infant, has been on hormone replacement since then.  Uro Clinic 2-25-05.  Dr. Abramson prescribed Depo-Testosterone 400 a month X 1 year.  Depo-testosterone is non formulary.  Plan:  Write DER for Depo-testosterone.

A treatment note from Chronic Illness Clinic dated April 6, 2005, shows that Plaintiff presented with pain in scrotum, status post removal of right testicular prosthesis on 3/26/05, and under Assessment it states:

HX Hypogonadism RX not approved

n)      Medical Records (exhibit 13)

Treatment note of August 1, 2005, says "I/M has a prescription for testosterone it is being faxed to pharmacy-they don't have it on file."  Then, "faxed script to pharmacy this date, responded to Joanne Terrell at Central Office and responded to Warden Howard Clark re:meds."  This entry is stamped "J.B. Watson, SEC Specialist, Jefferson CI."

o)      Physician's Order Sheets (exhibit 14)

Dr. Abramson completed a physician's order sheet for Depo-testosterone on 2/28/05 400 mg a month times one year.

**[THERE IS NO EXHIBIT 15]**

p)      Medical Records (exhibit 16)

Treatment notes of 1/18/06 show "advised of need to D/C Androderm patch [and] start Depo Testos per Dr. Cherry.  This entry is stamped P. Coleman-Gardera.

q)      Consultation Request dated 2/1/05 (exhibit 17)

The form requesting a urology consultation is signed by S. Gallardo and Dr. Scott Thayer it states:

**No. 4:06cv178-MP/AK**

Had bilateral orchictomy at 16 weeks of age.  Has been receiving hormone replacement therapy since (Depo-testosterone 250 mg every two weeks).  DER for Depo-testosterone has been disapproved.  Please advise.

r)   Consultant's Report dated 8/29/05 (exhibit 18)

Dr. Abramson wrote that Plaintiff had no problems with his right scrotum following surgery, but had pain in his left testicle and wanted the prosthesis removed.  He also noted that "Testosterone injection ---abscess, wants to consider alternative (gel/patch)."

s)   Consultant's Report (exhibit 19)

Dr. Abramson found a trapped right testicular prosthesis upon examination.

t)   Medical Records (exhibit 20)

Treatment note of 8/8/05 states:

Inc. Note: Formal grievance 0507-209-072 regarding request for testosterone and Tylenol #3 denied.  IM transferred to Jefferson CI 7/26/05.  Per phone conversation with ARNP in infirmary IM was prescribed testosterone last Wed 8/3/05.  He is being given Motrin for pain.  Pat Davis, RN

u)   Physicians Order Sheet (exhibit 21)

Shows an order for Testosterone 400 mg IM once a month for 12 months dated 7/21/05.

v)   Grievances (exhibit 22)

Same as attached to complaint. See above at page 3, Exhibit C to complaint.

x)   Medical Records (exhibit 23)

**No. 4:06cv178-MP/AK**

Treatment note of 7/20/05 shows F/U testosterone, "need to get testosterone re-ordered," "H/O [bilateral] orchectomy; requires supplemental testosterone," "DER written testosterone 400mg IM X 12."

**[No Exhibit 24]**

y)      <u>Letter (exhibit 25)</u>

Same as attached to complaint. <u>See</u> <u>above</u> page 4, Exhibit D to complaint.

z)      <u>Grievance (exhibit 26)</u>

Same as attached to complaint. <u>See</u> <u>above</u> page 2, Exhibit B to complaint.

aa)     <u>Medication and Treatment Record (exhibit 27)</u>[7]

Depo-testosterone is listed and a date blocked of 4/23/05.  The medication listed shows it is to start 2/28/05 and stop 2/28/06.

bb)     <u>DOC Technical Instructions for Prescription Orders (exhibit 28)</u>

Provides detailed procedures for medication administration.

cc)     <u>Medical Records (exhibit 29)</u>

Physician's Order Sheets show on 10/25/05 Dr. Tran authorized Androderm topical with instructions to discontinue the injections once the patch has been started. Also on 10/25/05, Dr. Tran authorized the Depo-Testosterone injection as well.

Treatment notes of 10/21/05 indicate that Plaintiff presented complaining of abscess and scarring at injection site and requesting Androderm patch instead of injection as Dr. Abramson had ordered.  It was noted that the medication was "not on formulary." [the stamp and signature of the physician examining Plaintiff is illegible].

---

[7] There were several pages between exhibit 26 and exhibit 29A that were not marked.  The court has marked them as set forth above as exhibits 27, 28, and 29.

**No. 4:06cv178-MP/AK**

dd)    Affidavit of JoAnn Phillips (exhibit 29A)

Ms. Phillips is Plaintiff's mother and attests in a sworn, but un-notarized affidavit,

that Plaintiff was denied testosterone in January 2005, and he had been taking it since

he was 13.  She states that Plaintiff had his testicles removed because of a rare tumor,

but Dr. Walker at Shands told her Plaintiff could live a normal life so long as he stayed

on testosterone.    When Dr. Johanson refused his testosterone, he lost both testicles

within a few months.  The prostheses had been surgically implanted by Dr. Walker.

When Plaintiff went to RMC, she began calling Dr. Thayer to tell him about the

testosterone, but he never called her back.  His secretary said he had received the

messages, but he did nothing and Plaintiff had to have both prosthesis removed

because his scrotum shrank and trapped them.

ee)    Email and Affidavit from G.E. Gill (exhibit 29B)

Email dated July 30, 2005, from E. Gill to Jefferson CI states:

My son, Inmate Gerald Gill DC #817634 has been on testosterone since
he was 13 years old.  He tells me he is being denied his testosterone now.
This is a serious problem and needs to be rectified asap.  I am sure your
medical staff knows the repercussions of stopping this treatment.  I will be
pursuing every avenue to be sure my son is receiving the needed medical
attention.

Affidavit of G. E. Gill, Sr. states again that his son had been receiving

testosterone since he was 13, and that he told Jefferson CI, but no one ever replied to

his email.  He complains that the denial of his son's basic medical attention has resulted

in unnecessary pain and disfigurement.

**V.    Analysis**

a)    Deliberate Indifference to Medical Needs

**No. 4:06cv178-MP/AK**

The state has a constitutional obligation to provide adequate medical care to those persons it has incarcerated because they must rely on prison authorities to treat them.  West v. Atkins, 487 U. S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).  See also DeShaney v. Winnebago County Dept. of Social Services, 489 U. S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) ("the affirmative duty to protect arises not from the States' knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The concept of deliberate indifference must be more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 511 U.S. 1216, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).  Subjective recklessness, as defined in criminal law, is the standard which must be shown for an official's actions to rise to the level of deliberate indifference.  Id.  Combining the standards from Farmer and Estelle, the Eleventh Circuit has clarified that, ultimately, there are four requirements to bringing an Eighth Amendment claim for the denial of medical care:  an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

No. 4:06cv178-MP/AK

Medical claims under the Eighth Amendment have an objective and subjective component, each of which additionally is considered to encompass two subsidiary requirements. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077, 121 S.Ct. 774, 147 L.Ed.2d 673 (2001). The "objective component" of the Eighth Amendment standard requires a determination whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. See Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). This objective component varies with the situation and the conduct in question and is responsive to "contemporary standards of decency." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); see also Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). An objectively serious deprivation requires (1) showing an objectively "serious medical need." Estelle, 429 U.S. at 104. A serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). In addition, an objectively serious deprivation requires (2) showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain" and not simply "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. Estelle, 429 U.S. at 105-06 (internal quotation marks omitted). See Taylor, 221 F.3d at 1257; see also Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

**No. 4:06cv178-MP/AK**

would easily recognize the necessity for a doctor's attention."  Farrow, at 1243, quoting

Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994).

To show the required subjective intent to punish the plaintiff must demonstrate

that the defendant acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at

105.  This is defined as requiring (1) an "aware[ness] of facts from which the inference

could be drawn that a substantial risk of serious harm exists" and (2) the actual

"draw[ing of] the inference." Farmer, 511 U.S. at 837.  In sum, in a claim of denial of

medical attention under the Eighth Amendment "[u]ltimately, there are [] four

requirements: an objectively serious need, an objectively insufficient response to that

need, subjective awareness of facts signaling the need, and an actual inference of

required action from those facts."  Taylor, 221 F.3d at 1258.

The medical history of Plaintiff is not controverted insofar as he entered the DOC

with a history of testicular tumors or cancer which resulted in the removal of his testes

and implantation of prosthetic testicles.  There also seems to be no issue with regard to

his having received regular injections of testosterone for decades prior to his

incarceration and subsequent to his incarceration in 2003 until January 2005.  All of the

medical records submitted express the opinion that Plaintiff's condition was a serious

medical need and the administration of testosterone was a necessary component of his

treatment and should be administered regularly.  Under the definitions of serious need

set forth above, the undersigned finds that this element of Plaintiff's claim is supported

by the medical record.

**No. 4:06cv178-MP/AK**

The issues for inquiry are: (1) whether there was an insufficient response to Plaintiff's medical need, *i.e.* were these injections discontinued; (2) whether Defendant Dr. Thayer was aware of this discontinuation; and (3) whether Dr. Thayer actually drew the inference that this discontinuation may be harmful and action should be taken.

For reasons unknown to the Court, Defendants have not offered the best evidence to support their motion--medication logs that show administration of testosterone from January 2005 through October 2005.  In fact the only medication logs submitted by Defendants concern the administration of pain medication (at issue in the claims against Defendant Johanson).  (Doc. 77, Johanson Affidavit, Exhibit 9). Defendant Thayer offers as proof that Plaintiff received his injections in February 2005, Plaintiff's acknowledgment in a grievance written on February 25, 2005, that he received a shot.  (Doc. 77, Thayer Affidavit, Exhibit 8).  As proof that Plaintiff received his injections in April, May and June 2005, Thayer attached an illegible response to another grievance written by Plaintiff that purports to indicate that he received shots during these months.  (Doc. 77, Thayer Affidavit, Exhibit 3).

Plaintiff has attached copies of medication logs that show in February 2005, the dates of 2/8 and 2/21 were blocked off, but a notation beside the date of 2/21 states "D/ C 1/25/05" which suggests that the shots were discontinued on January 25, 2005.  This version of the facts comports with a DER for the shots dated 1/12/05 that was disapproved with the notation, "Why is hormone replacement necessary.  There is no adverse effect from withholding this med."  (Doc. 77, Johanson Affidavit, Exhibit 1).[8]

---

[8]  The doctor who disapproved this DER and wrote this notation was identified in discovery as Dr. Daniel Cherry, who is the defendant in Case No. 4:07CV222.

**No. 4:06cv178-MP/AK**

Also supporting Plaintiff's version of the facts, that the injections had been discontinued at this time (January 2005), is a request by Dr. Gallardo for a urology consultation dated 2/1/05 that states "DER for Depo-Testosterone has been disapproved." (Doc. 123, Exhibit 17). Dr. Thayer's stamp and initials are on this request. Records from an Emergency Room visit on February 22, 2005, for pain in his testicles shows shrinkage of the scrotum and no depo-testosterone for two months. (Doc. 77, Thayer Affidavit, Exhibit 7). Dr. Abramson examined Plaintiff on February 25, 2005, and found a "trapped right testicle," which he removed on March 28, 2005. (Doc. 77, Abramson Affidavit, Exhibits 1 and 2).

Although Dr. Thayer contends that he approved the testosterone injections on March 25, 2005, and a supplement on April 20, 2005 (doc. 77, Thayer Affidavit, exhibits 1 and 2), he neither attached nor addressed a DER request from Dr. Tran on March 25, 2005, that he did not approve. Whether or not the DER provided by Defendant is fabricated, as Plaintiff contends, Plaintiff has submitted a contrary DER.[9] The authorization section is stamped and initialed by Dr. Thayer, but not completed, and shows that the DER was received by the pharmacist, but indicates that no drugs were dispensed. (Doc. 123, Exhibit 10). Other evidence supports Plaintiff's contention that he was not receiving injections at this time as well. A treatment note from the Chronic Illness Clinic dated April 6, 2005, by Dr. Tran shows that Plaintiff had a history of hypogonadism, and that his prescription for this condition was not approved. (Doc. 123, Exhibit 12).

---

[9] Plaintiff had some difficulty during discovery in obtaining this DER, an issue which ultimately required court intervention. (See Docs. 107, 111).

**No. 4:06cv178-MP/AK**

It is not clear to the Court whether Plaintiff received regular injections during May or June, but the evidence supports that at least in July 2005 he was again having difficulty. Plaintiff complained on 7/20/05 in a three page grievance that he had not received his testosterone when a 90 days supply written by Dr. Abramson ran out. (Doc. 1, Exhibit C).  His father wrote an email to Central Office on July 30, 2005, pleading that his son's testosterone be resumed or there would be serious repercussions to his health.  (Doc. 123, Exhibit 29B).  A treatment note at RMC dated July 20, 2005, states "F/U on testosterone" and "need to get testosterone re-ordered." Another treatment note dated 8/1/05 states "I/M has prescription for testosterone it is being faxed to pharmacy-they don't have it on file."  (Doc. 123, Exhibit 13).  Also, an incidental note to his medical record dated 8/8/05 in response to his grievance states that he had been prescribed testosterone on 8/3/05.  (Doc. 123, Exhibit 20).  This would be in accord with the evidence submitted by Dr. Thayer that he received an inquiry from the Central Office and responded that Plaintiff had received his injection on 8/3/05, (doc. 77, Thayer Affidavit, exhibit 4), but the overall picture is that Plaintiff was not receiving his injections regularly at this time.  Defendants have not come forth with any evidence to the contrary.

By August 29, 2005, Plaintiff was again seen by Dr. Abramson with pain in his left testicle, (doc. 123, exhibit 18), which Dr. Abramson removed on October 3, 2005.

Based on the above, the undersigned is of the opinion that there are several material facts in dispute that warrant denial of summary judgment.  First, there is no evidence that definitively shows when Plaintiff received testosterone injections from

**No. 4:06cv178-MP/AK**

January 2005 through October 2005.  The evidence supports Plaintiff's version of the facts that beginning in January 2005 he began having difficulties receiving his injections regularly despite Physician's Orders for the drug and treatment notes indicating that Dr. Tran and Dr. Abramson felt it medically necessary that he have the injections.  The only medication logs concerning testosterone were provided by Plaintiff and do not cover the entire period in question, are unclear at best, and seem to indicate that the injections were discontinued on January 25, 2005.

Second, is the fact regarding who caused the injections to stop.  There is one DER in January 2005 that appears to have been disapproved by Dr. Cherry, who is not a defendant in this case, but Dr. Thayer was aware at least by 2/1/05 that the injections had been disapproved when he signed a urology consultation. There is also the matter of the DER on March 25, 2005, that Dr. Thayer neither approved nor disapproved, but had the effect apparently of acting as a disapproval.  Based on the above, the undersigned is of the opinion that Defendant Thayer had an awareness of the facts from the grievances, the physician's DER's, treatment notes, and Physician's Order Sheets, that Plaintiff had a serious medical need that was not being met and that a substantial risk of harm could result if the testosterone was not resumed.  The undersigned also finds that Defendant Thayer actually drew such an inference when he signed the urology consultation request form in February 2005, and when he advised Central Office that the administration of testosterone to Plaintiff was "clinically indicated."  As Chief Medical Officer with authority to approve non-formulary drugs, sufficient facts are

**No. 4:06cv178-MP/AK**

in dispute regarding his inaction to have these injections approved and administered to deny summary judgment.

Finally, there is a factual dispute over the causation factor, i.e. whether cessation of the testosterone caused his scrotum to shrink and whether shrinkage caused the prostheses to be removed.  Dr. Abramson states in his affidavit that he does not recall ever telling Plaintiff that his scrotum had shrunk as a result of being without testosterone, and that it was his medical opinion that being without testosterone for two months or less would not result in such shrinkage.  Plaintiff claims that Dr. Abramson expressed to him personally a contrary opinion and he should be granted the opportunity to depose Dr. Abramson and to obtain his own expert opinion.

An emergency room record used the term "shrinkage" in assessing Plaintiff's condition, and Abramson himself referred to the prosthesis as "trapped," which implies that the area around it had shrunk.  The undersigned is not a medical expert, but it is highly suggestive even to a layman that there may be some correlation between the denial of testosterone in January or February and the removal of a prosthesis in March that had been implanted for nearly thirty years without incident.  The fact that the other prosthesis had to be removed a month or so after a similar allegation of denial is very persuasive, and can, in the opinion of the undersigned only be resolved by medical testimony and credibility determinations made by the trier of fact, which in this case would be a jury. Therefore, judgment as a matter of law should not be granted.

      b)    <u>Eleventh Amendment Immunity</u>

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

**No. 4:06cv178-MP/AK**

United States by Citizens of another State, or by Citizens or Subjects of
any Foreign State." Amendment XI, Constitution of the United States.

The principal significance of the Eleventh Amendment is its limitation of the grant
of power conferred upon the federal judiciary by Article III of the Constitution.  Penhurst
State School & Hospital v. Halderman, 465 U.S. 89, 98 (l984).  Despite the limited
language of the Eleventh Amendment, it prohibits suit by a citizen against his own state.
Id.  Eleventh Amendment immunity may be waived, id., at 99, but there is no suggestion
that it has been waived in this case.

A suit against an agency or department of a state is, for Eleventh Amendment
purposes, the same as a suit against the state itself.  Id., at l00.  Here, defendant  is
sued in both his individual and official capacity.  A suit against a state official in his
official capacity is a suit against the state itself to which the state's Eleventh Amendment
immunity applies.  Kentucky v. Graham, 473 U.S. l59, l67 (l985).  See also, Brandon v.
Holt, 469 U.S. 464, 47l-473 (l985).

A limited exception to the Eleventh Amendment immunity of state officials sued in
their official capacities has been recognized where prospective relief is sought against a
state official in a suit challenging the constitutionality of his actions.  Penhurst State
School & Hospital v. Halderman, supra, at l02-l03.  Thus, a state official who has
allegedly violated constitutional rights of a plaintiff may be sued in his official capacity
for injunctive or declaratory relief governing his future conduct, but is immune, in his
official capacity, to suit for retroactive monetary relief (damages) arising out of the same
conduct.  Id.

**No. 4:06cv178-MP/AK**

Thus, insofar as Plaintiff seeks injunctive and declaratory relief his claims are not barred by the Eleventh Amendment, but are moot since he is no longer incarcerated. See Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988); Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1986) (an inmate's claim for injunctive or declaratory relief in a 1983 case is rendered moot upon his transfer to another institution).  This is true, as well, when the prisoner is released from incarceration.  Scott v. District of Columbia, 139 F.3d 940 941 (D. C. Cir. 1998), *cert. denied* 525 U.S. 851 (1998).  Thus, Plaintiff's claims against the defendant[s] in their official capacity should be deemed moot as a matter of law.

      c)    Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted). To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (internal quotation marks omitted). "Once the defendant establishes that he was acting

**No. 4:06cv178-MP/AK**

within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346 (quoting Saucier, 533 U.S. at 201).

Under Plaintiff's version of the facts, a constitutional violation clearly occurred and the law concerning deliberate indifference to serious medical needs was clearly established at the time of this occurrence.  This claim is not well taken and summary judgment should not be granted on this basis.

     d)    Punitive Damages

A prison official may be liable under section 1983 for punitive damages upon a finding that his conduct constituted a reckless or careless disregard for the inmate's rights.  Smith v. Wade, 461 U.S. 30 (1983).  Since Defendant has not conceded that the injections were discontinued, he has also provided no explanation for the acts or inaction that resulted in the discontinuation of the medication.  Thus, there is not a

**No. 4:06cv178-MP/AK**

sufficient factual basis to make any finding on this claim.  Thus, the punitive damages claim should not be dismissed as a matter of law either.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment (doc. 77) be **GRANTED IN PART**, only insofar as Plaintiff's claims against both Defendants in their official capacities for monetary damages are precluded by law and his claims against them for injunctive relief is **MOOT**.  The motion (doc. 77) should be **DENIED IN ALL OTHER RESPECTS**, and this cause remanded to the undersigned for further proceedings to include possible appointment of counsel pursuant to Poole v. Lambert, 819 F.2d 1025, 1028 (11th Cir. 1987), and 42 U.S.C. §1988 (provides for fees and expenses to counsel for prevailing party in suits brought under 42 U.S.C. §1983).

**IN CHAMBERS** at Gainesville, Florida, this __*31st*__ day of October, 2007.


*s/ A. KORNBLUM*_____
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 10 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

**No. 4:06cv178-MP/AK**